**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **IN RE:** | |
| TAYLOR INVESTMENT | |
|   PARTNERS II, LLC, | CHAPTER 11 |
| Debtor. | CASE NO.:  15-51333-MHM |
| | |
| MOE'S FRANCHISOR LLC | |
| Movant, | |
| vs. | CONTESTED MATTER |
| TAYLOR INVESTMENT PARTNERS, | |
|   II, LLC; TIP II – ANSLEY, LLC; | |
|   AND TIP II – SUBURBAN, LLC, | |
| Respondents. | |

**MOTION BY MOE'S FRANCHISOR LLC**
**FOR RELIEF FROM THE AUTOMATIC STAY**
**TO EXERCISE ALL RIGHTS UNDER FRANCHISE**
**AGREEMENTS, INCLUDING TERMINATION**

Moe's Franchisor LLC ("Moe's"), the franchisor of the Moe's Southwest Grill® brand,

moves pursuant to Section 362(d) of the Bankruptcy Code for relief from the automatic stay to

exercise its rights to terminate the franchise agreements for two Moe's Southwest Grill

restaurants operated by Debtor Taylor Investment Partners II, LLC ("TIP") and two Debtor

affiliates, TIP II-Ansley, LLC ("TIP-Ansley") and TIP Suburban, LLC ("TIP Suburban")

(collectively, "Debtors"), as well as to exercise other rights afforded Moe's under the Bankruptcy Code.[1]

The Chapter 11 cases of Debtors were filed in bad faith for the sole purpose of evading the termination of the franchise agreement for the Moe's restaurant operated by TIP-Suburban in Decatur, Georgia (the "Decatur Location") scheduled to take effect on January 25, 2015--three days after the Chapter 11 filings.[2]  Debtors' schedules show no indication that they are unable to meet their obligations on an ongoing basis, and at the hearing on "first day" motions Debtors' counsel admitted their intent to evade the impending termination.  Further supporting Debtors' bad faith filing, they refused an offer of over $1 million for the restaurants from an approved purchaser.

The concept of franchising in the United States, particularly in the restaurant industry, has noteworthy economic impact.  Successful franchising hinges upon a franchisor's ability to generate public recognition and acceptance of a brand based upon the quality, consistency and uniformity of the products and services offered by its franchisees.  A franchisor's success is dependent upon its ability to effectively and efficiently develop, maintain and enhance these qualities.  In stark contrast, Debtors, acting primarily through their principal, David Titshaw ("Mr. Titshaw"), have undermined the Moe's Southwest Grill brand and image by their repeated

---

[1] TIP, TIP-Ansley and TIP-Suburban are sometimes referred to collectively herein as "Debtors".  Debtors are each Chapter 11 debtors pursuant to voluntary petitions filed in this Court on January 22, 2015.  A motion has been filed in each Chapter 11 case for procedural consolidation for administrative purposes into this Chapter 11 case (Dkt. No. 15-51333) of the TIP-Ansley case (Dkt. No. 15-51355) and of the TIP-Suburban case (Case No. 15-51339).

[2] While the Franchise Agreement for the Decatur Location (attached to the Declaration (the "Dec.") as Exhibit 3) identifies the franchisee as TIP, the signature line indicates a signature on behalf of TIP-Ansley and it appears TIP-Suburban has operated the Moe's Restaurant at the Decatur Location.  The other Moe's Restaurant located at the Ansley Mall in Atlanta (the "Ansley Location") provides for TIP as the franchisee based on an assignment approved in writing by Moe's (Dec., Exhibit 1) although TIP-Ansley has operated that restaurant.

EAST\95887882.4

defiance and disregard of Moe's system standards, culminating in the termination of the franchise agreements for both of Debtors' Moe's restaurants. And even after the parties had arbitrated the issue of the propriety of those terminations and Debtors were given another chance by the arbitrator to come into compliance with Moe's standards, they failed to do so at the Decatur Location resulting in Moe's issuance of a termination notice for the Decatur Location. Stay relief is justified to permit Moe's to effect the termination of the Decatur Location consistent with the arbitrator's decision in the arbitration proceeding agreed to by Moe's and Debtors.

While Chapter 11 provides protection to a debtor through the automatic stay under Section 362 of the Bankruptcy Code, the Bankruptcy Code also recognizes and protects rights of non-debtor parties, including rights of franchisors seeking to protect their various trademarks, service marks and the other attributes of their proprietary operating systems. As such and as applied in the Eleventh Circuit, as well as other United States Circuit Courts of Appeal, and as discussed in more detail herein under the holding of *City of Jamestown v. James Cable Partners, L.P. (In re James Cable Partners, L.P.)*, 27 F.3d 534 (11th Cir. 1994) (commonly referred to as the "hypothetical test"), Debtors, under Section 365(c) of the Bankruptcy Code, may not assume or assign the franchise agreements without the express consent of Moe's, because applicable trademark law precludes an assignment without franchisor consent.[3]  As a result, Debtors may not assign and may not assume the franchise agreements. As events recounted herein

---

[3]  Bankruptcy Code Section 365(c) provides: "The trustee [or debtor-in-possession, as applicable here] may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if-

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment…."

demonstrate, Debtors have repeatedly demonstrated that they are not capable of upholding the high standards required of franchisees in the Moe's system.

Moreover, pursuant to Section 365(e)(2) of the Bankruptcy Code, as the franchise agreements are subject to Section 365(c) of the Bankruptcy Code, which prevents assumption and/or assignment without Moe's consent, the so-called "ipso facto" termination prohibition of Section 365(e)(1) of the Bankruptcy Code does not apply.[4]

Accordingly, Moe's should be granted stay relief under Section 362(d) of the Bankruptcy Code to exercise termination rights under the franchise agreements (i) as to the Decatur Location due to the termination notice, (ii) as to both locations due to the proscriptions of Section 365(c)(1) of the Bankruptcy Code, (iii) as to both locations under Section 365(e)(2) of the Bankruptcy Code, and (iv) for other "cause" as demonstrated herein.[5]

---

[4] Bankruptcy Code Section 365(e)(1) provides: "Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on-

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

(2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if-

(A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(ii) such party does not consent to such assumption or assignment…. "

[5] In connection with the arbitration, and prior thereto, Moe's delayed implementation of the franchise terminations to allow Debtors to pursue a sale to an existing franchisee or other party acceptable to Moe's to allow Debtors to recoup any value in their restaurant operations. Debtors did so and have solicited such offers but none have been presented to Moe's for approval. Even Debtors have professed in this bankruptcy case that one of their objectives is to sell at least the Atlanta Location. Moe's continues to be receptive to a deliberate process to market these restaurants and to solicit bids from parties acceptable to Moe's. However, Moe's opposes any such leniency, subterfuge or procrastination on the part of the Debtors.

EAST\95887882.4

In further support of the requested relief, Moe's states as follows:

### Jurisdiction

1.     On January 22, 2015 (the "Petition Date"), each Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Each Debtor has retained its property and is operating as a debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code.

2.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G) and (O).

3.     The statutory predicates for this motion are Sections 362 and 365 of the Bankruptcy Code and Bankruptcy Rule 4001 of the Federal Rules of Bankruptcy Procedure.

### Background

4.     The Moe's Southwest Grill restaurant concept originated in Atlanta, Georgia in or around 2000, focusing primarily on the service of made-to-order "Southwest fare".

5.     In or around August, 2007, the Moe's Southwest Grill brand and franchise rights were acquired by FOCUS Brands Inc. ("FOCUS"), which has extensive experience as an owner and operator of various well-known franchise brands such as Carvel®, Cinnabon®, and Schlotzsky's® Deli, among others.  At the time of its acquisition of the Moe's Southwest Grill brand, FOCUS believed that the brand and its network of franchisees had underperformed significantly and that a substantial opportunity existed for growth and improvement of the existing units if compliance with the quality standards was better enforced, among other things.

6.    Under the ownership of FOCUS, the Moe's Southwest Grill system has grown dramatically and today there are more than 580 Moe's Southwest Grill restaurants in the United States and abroad.

**Debtor Franchisees**

7.    TIP, a Georgia limited liability company, on May 15, 2003 entered into the Assignment, Assumption and Consent Agreement (the "Ansley Assignment" attached as Exhibit 1 to the Dec) by which TIP, with the required consent of Moe's, acquired the rights from a previous franchisee to operate a Moe's Restaurant in Atlanta, Georgia at the Ansley Mall, located at 1544 Piedmont Avenue, Atlanta, Georgia 30306 (the "Ansley Location") subject to the Moe's Southwest Grill, L.L.C. Franchise Agreement dated September 6, 2002 entered into between Moe's predecessor and the predecessor franchisee (the "Ansley Franchise Agreement" attached as Exhibit 2 to the Dec).  Although TIP is the franchisee of record for the Ansley Location, the Ansley Location is operated by TIP-Ansley.

8.    Pursuant to the Moe's Southwest Grill, L.L.C. Franchise Agreement dated March 5, 2004 (the "Decatur Franchise Agreement") entered into between Moe's predecessor and TIP, TIP was authorized, pursuant to the terms and conditions set forth therein, to operate a Moe's Restaurant at Suburban Plaza, located at 1524-A Church Street, Decatur, Georgia 30033 (the "Decatur Location").  Although TIP is the franchisee of record for the Decatur Location, it appears that the Decatur Franchise Agreement was executed by Mr. Titshaw on behalf of TIP-Ansley, and the Decatur Location is operated by TIP-Suburban.

9.    As acknowledged in each Franchise Agreement, Moe's has incurred "substantial expenditure of time, effort and money" to develop and implement the "Moe's System."

10.     As each Franchise Agreement confirms, distinguishing features of the Moe's System include the name, specifically designed fixtures, equipment, buildings, containers and other items used in serving and dispensing food products, signs, emblems, insignia, logos, trade names, trademarks and service marks, products, methods, procedures, recipes, distinctive food products and the formula and quality standards therefor as well as instructional materials and training courses developed by Moe's.

11.     Each Franchise Agreement confirms that the franchisee recognizes the value of uniformity and Moe's knowledge and experience gained through the operations of Moe's Restaurants and the value of the intellectual property and other distinctive features of the Moe's System.

12.     As provided by Section 7 of each Franchise Agreement, the franchisee recognizes the mutual benefit to and importance of the uniformity of appearance, service, products and advertising of the Moe's System as critical to the success of the Moe's concept.  Accordingly, each franchisee commits to compliance with all the requirements of the Moe's System, including:

i.      Restaurant operation in accordance with Moe's specifications, standards, business practices and policies, and

ii.     The right of Moe's to reasonable inspection of premises, equipment, food products and ingredients to insure such compliance.  (Section 7 of each Franchise Agreement enumerates a long list of other requirements to assure compliance with the Moe's System.)  In the enforcement of compliance with the requirements of Moe's System, Moe's offers counseling and advisory services and other operating assistance and training to each franchisee.

EAST\95887882.4

Document    Page 8 of 22

13.    Section 13 of each Franchise Agreement specifies the extent to which Moe's rigorously enforces the value of its trade names, trademarks and service marks.

14.    Consistent with Moe's protection of its rights under Section 365(c)(1) of the Bankruptcy Code, as specified in Section 17 of each Franchise Agreement, a franchisee shall not "sub-Franchise, sell, assign, transfer, convey or encumber its rights and obligations … [under the Franchise Agreement] without the prior express written consent of Franchisor".  Such prior written consent of Moe's is also required for any change in the ownership composition of each franchisee.

15.    Consistent with Moe's protection of its rights under Section 365(e)(2) of the Bankruptcy Code, Section 19 of each Franchise Agreement provides for termination if the franchisee files a voluntary bankruptcy petition, among other events of insolvency as set forth more specifically in Section 19.

16.    Consistent with Moe's protection of the Moe's System, pursuant to Section 19(c) of each Franchise Agreement, Moe's may terminate a Franchise Agreement if the franchisee has failed to perform various terms and conditions contained in the Franchise Agreement and (i) such default continues for thirty (30) days after Moe's has given written notice of such default to the franchisee or (ii) if the default is not curable within thirty (30) days, then if the default is not remedied with reasonable diligence.

17.    Also, pursuant to Section 19(d)(4) of each Franchise Agreement, no cure opportunity is afforded and Moe's may terminate a Franchise Agreement if a franchisee has received at least three default notices within a twelve-month period.

**Restaurant Operations and Standards Evaluation ("ROSE")**

18.    To both assist its franchisees in operating their restaurants and monitor franchisees' adherence to the Moe's System, Moe's has developed a mechanism known as the "ROSE (Restaurant Operation and Standards Evaluation) report.   Each Moe's restaurant is inspected unannounced using the ROSE report at least twice a year.   Moe's franchise business consultants evaluate the restaurants in a number of areas, including cleanliness, customer service, food preparation and restaurant management, and fill out a ROSE report that calculates a score based on a designated number of points for each listed criteria.

19.    Under Moe's compliance procedures, which are incorporated into the franchise agreement, a franchisee must score an eighty percent (80%) to pass a ROSE inspection, and two consecutive failing scores results in the franchise agreement being placed in default status.   At such point, the franchisee must then pass a third unannounced ROSE inspection roughly thirty days thereafter in order to cure the default, or else the franchise agreement is subject to termination.

**Debtors' Performance as Franchisee**

20.    Debtors, operating through their principal, Mr. Titshaw, apparently had a history of difficult relations with Moe's predecessor, and that circumstance did not change when FOCUS acquired the brand.[6]

---

[6]   The Debtors' Schedules divulge various litigations instigated by one or more Debtors against Moe's or its predecessor but do not report the accurate status of such litigations.   The so-called "Massey Litigation" resulted in a judgment after trial in favor of Moe's predecessor.   The Fulton County Superior Court action which led to arbitration was dismissed in 2013.   A third Magistrate Court action by Debtors has been inactive since 2012.

21.     As recited in the Declaration, there is an extensive history of resistance and defiance by the Debtors, through Mr. Titshaw, of compliance with Moe's operating systems, as demonstrated in part by their repeated failing scores on ROSE inspections.

22.     In addition, Debtors have significantly under-performed at the Decatur and Ansley locations as compared to other Moe's Restaurants in the Atlanta market in terms of revenue growth, and their cost of goods and labor cost percentages have been higher than average.

23.     Starting in 2010 the ROSE inspections for the Decatur and Ansley Locations showed a decline in operations and identified numerous, repeated violations of Moe's system standards.

24.     In June 2012 both locations failed their ROSE inspection due to a series of continuing violations involving poor maintenance and shabby presentation that undercut the Moe's concept (as examples, chairs and booths required reupholstering, cutting boards were badly worn, edge molding around dining room tables was worn and torn, storage cooler shelves were rusted and unsanitary, and employees were not wearing proper uniforms).  Cleanliness problems were also prevalent, particularly at the Decatur Location.

25.     Extensions were granted for Debtors to address these deficiencies and in September 2012, for example, retraining was provided at the Atlanta Location for managers and employees of both restaurants on food preparation, customer service, cleanliness issues, etc.

26.     None of Debtors' restaurant managers had attended necessary training classes to be certified as managers by Moe's, itself a glaring violation of the Moe's System.

27.    A re-inspection of Debtors' restaurants was conducted in December 2012 and the vast majority of the deficiencies had not been corrected.  In fact, operationally the restaurants were in worse shape than they had been during the previous ROSE inspection.

28.    In written communications with his managers regarding the 2012 ROSE inspections, Mr. Titshaw himself disparaged the restaurant operations and his own employees. However, to Moe's dismay, he demonstrated no inclination to resolve these deficiencies.

29.    Based on Moe's compliance enforcement procedures, the Franchise Agreements were placed in default in December 2012 and were then subject to termination unless Debtors were able to pass ROSE inspections of each restaurant scheduled to occur approximately thirty (30) days thereafter.

30.    The third and final ROSE inspections were conducted in February 2013, and again the restaurant operations at each location had worsened.  The ROSE inspections identified significant problems with cleanliness, food preparation, and branding elements.  Each restaurant failed its ROSE inspection and, as a result, the termination notices were sent to Debtors. Specifically the failures included:

(i)    maintaining and operating each restaurant in good condition and repair,

(ii)    requiring all employees in each restaurant to wear uniforms confirming to Moe's specifications,

(iii)    using only ingredients that conform to the standards and specifications designated by Moe's,

    (iv)      maintaining all machinery and equipment used in each restaurant in appropriate working condition and promptly making all repairs necessary to maintain maximum efficiency and productivity,

    (v)      displaying all advertising that Moe's required and not displaying any advertising or signs which Moe's does not authorize, and

    (vi)      ensuring that the restaurant managers completed Moe's mandatory training.

31.    At Debtors' request, Moe's granted two lengthy termination deferrals to Debtors to permit them to sell their restaurants to replacement franchisee(s) acceptable to Moe's. The final deferral expired on October 23, 2013.

32.    Debtors did receive an offer from another existing franchisee for over $1 million but refused to pursue any sale. Instead, in October, 2013, TIP filed a lawsuit to prevent the termination of the Franchise Agreements. Moe's and Debtors agreed to arbitrate the termination dispute and to permit the restaurants to operate in the interim.

33.    The parties then submitted their dispute over the termination of the franchises to binding arbitration (AAA No. 30 20 1300 0882).

34.    The arbitrator issued a written decision (the "Arbitrator's Award") (attached as Exhibit 4 to Dec), which confirmed the legitimacy and importance of Moe's objective to protect the consistency of Moe's quality standards across its franchised restaurants. However, instead of affirming the propriety of the terminations and leaving Debtors with no further ability to sell the locations, the arbitrator decided to afford Debtors one last opportunity to conform to Moe's quality standards prior to the Franchise Agreements being terminated, or sell their restaurants.

EAST\95887882.4

35.     Accordingly, the arbitrator determined that one more ROSE inspection be conducted at the Ansley Location and the Decatur Location.  If a passing score was achieved, then the termination notice would be rescinded for the passing location and be of no further force and effect.  Alternatively, if a passing score was not achieved, then the termination could proceed for the failing location.

36.     In the event of a failed inspection, Moe's was entitled to proceed with a termination upon the earlier of (i) a sale of the location to another franchisee pursuant to each Franchise Agreement acceptable to Moe's, or (ii) six months after the date of the failed inspection.

37.     To assist Debtors, the arbitrator provided guidelines for the conduct of the ROSE inspections:  requiring that the inspections not be conducted during normal lunch hours, and prohibiting Moe's from using the "multiplier effect" with respect to any deficiency noted in a previous ROSE inspection.  Further conditions were set forth that limited how Moe's could score the ROSE inspections, all of which worked in favor of Debtors.

38.     These determinations were incorporated into the Arbitrator's Award as set forth therein (Exhibit 4 to Dec).[7]

39.     The Decatur Location failed its ROSE inspection undertaken pursuant to the Arbitrator's Award, with a score of 72%.  The Ansley Location passed with a score of 89%.

---

[7]  The Arbitrator further noted that the evidence clearly established that the relationship between Moe's and Debtors was very poor — as having "toxic proportions" — and not likely to improve.  The arbitrator concluded "both parties would be better served if this Franchisor/Franchisee relationship ended."  The arbitrator strongly recommended to Debtors that, even if one or both restaurants passed the ROSE inspections, the parties should endeavor to arrange a sale on commercially reasonable terms.

EAST\95887882.4

Accordingly, on August 4, 2014, in compliance with the Arbitrator's Award, a termination notice was sent to TIP and Mr. Titshaw to effect the termination of the Decatur Location effective January 25, 2015.  (Exhibit 5 to the Dec).  In accordance with the Arbitrator's Award, the termination was deferred for six months from the failing ROSE inspection to enable Debtors to pursue a sale.  Debtors did not take advantage of that opportunity, despite repeated encouragement in writing from Moe's to do so.  Nor did Debtors take any steps to challenge the propriety of the termination during that six-month period.

40.    It is abundantly clear that these bankruptcy cases were filed to again avoid implementation of the termination.  Debtors' counsel admitted as much during the hearing on "first day" motions.

## Bankruptcy Code Section 365(c)(1) Compels the Termination

41.    Independent of the system-standards-based defaults under the Franchise Agreements, adequate grounds to terminate the stay as to the Franchise Agreements exist because the Franchise Agreements are unassumable under Bankruptcy Code Section 365(c) in the Eleventh Circuit.  The Eleventh Circuit adheres to the "hypothetical test" and prohibits the assumption of an executory contract where assignment of that contract is not permissible under applicable non-bankruptcy law and there is no consent by the counter party.  *See, e.g.*, *In re James Cable Partners, L.P., supra* at 537; *Matter of Travelot Co.,* 286 B.R. 447 (Bankr. S.D. Ga 2002).  Trademark law is "applicable law" within the meaning of Bankruptcy Code Section 365(c) sufficient to excuse a party from accepting performance from any other entity.  *See, e.g.*, *Perlman v. Catapult Entertainment, Inc. (In re Catapult Entertainment, Inc.)*, 165 F.3d 747, 749-50 (9th Cir. 1999); *In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300, 308-10

(Bankr. D. Del. 2001); *Matter of Travelot Co.*, 286 B.R. at 454.  Moe's will not consent to the assumption of the Franchise Agreements by Debtors.  Thus, the bankruptcy estate has no legally enforceable interest in those Franchise Agreements for purposes of its reorganization.

42.    As the Eleventh Circuit has held *In re James Cable Partners, L.P.*, a debtor-in-possession, such as each of the Debtors, has all of the duties (as well as the rights and powers) of a trustee.   Accordingly, the assumption prohibition of Bankruptcy Code Section 365(c)(1) applies upon two conditions:    (i) "applicable law" must excuse Moe's from accepting performance from an entity other than the Debtors and (ii) Moe's has not consented to an assumption of the Franchise Agreements.

43.    Under the Lanham (Trademark) Act (15 U.S.C. §§ 1051, <u>et</u>. <u>seq</u>.) which governs trademark law in the United States, a "trademark" includes "any word, name, symbol, or device, or any combination thereof" which identifies and distinguishes goods or products and their source and a "service mark" means "any word, name, symbol or device or any combination thereof" which identifies or distinguishes the source of services, all as defined in 15 U.S.C. § 1127.  The Moe's System includes a variety of trademarks and service marks entitled to protection under the Lanham Act, which forms the "applicable law" entitled to protection under Section 365(c)(1).  Because trademarks and service marks are used by definition to identify goods and services with a particular organization, such trademarks and service marks are considered personal in nature and non-delegable.  *See 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition* § 25:33 (4th ed. 2011).

44.    The analysis of the Eleventh Circuit in *In re James Cable* was followed by the United States Bankruptcy Court for the Southern District of Georgia in *Matter of Travelot Co.*,

286 B.R. 447 (Bankr. S.D. Ga. 2002), as that court plainly stated, "the plain terms of § 365(c) bar a debtor-in-possession from assuming an executory contract if applicable law would bar assignment to a hypothetical third party."  286 B.R. at 454.

45.     As the Bankruptcy Court found, federal trademark law (the Lanham Trademark Act as previously recited) governs rights in trademarks and service marks and protection from infringement.  Further, trademark law is "applicable law" within the scope of Section 365(c) of the Bankruptcy Code, as the Bankruptcy Court determined, citing *In re Catapult Entertainment Inc., supra; In re Golden Books Family Entertainment, Inc., supra*.  The presence of "applicable law" sufficient under Bankruptcy Code Section 365(c) precludes even assumption of a franchise agreement without Moe's consent.[8]

46.     As the Bankruptcy Court in *Travelot Company* elaborated, a federal trademark registrant is entitled to nationwide trademark protection, including the application of law which precludes unauthorized assignment of a trademark license.  286 B.R. at 455.[9]

47.     As Bankruptcy Code Section 365(c) provides no "safe harbor" for Debtors, this Court should grant stay relief to Moe's because (i) Bankruptcy Code Section 365(c)(1) applies to preclude assumption, and (ii) Section 365(e)(2) applies to permit Moe's to exercise termination rights under the Franchise Agreements.

---

[8] "A trademark registrant may successfully sue an infringer upon a showing that the infringer, without authorization from the registrant, used the mark in commerce and that the unauthorized use caused or was likely to cause confusion or deception," *Davidoff & Cie, S.A. v. PLD Int'l. Corp.*, 263 F.3d 1297, 1300-01 (11th Cir. 2001), confirming the applicability of Bankruptcy Code Section 365(c) to trademark law.

[9]   While the Bankruptcy Court in *Travelot Company* found no trademark license to exist, and thereby the inapplicability of the Bankruptcy Code 365(c) assumption restriction, there can be no argument but that the Franchise Agreements here constitute executory contracts that involve a license of various trademarks and service marks.

## Grounds for Automatic Stay Relief

48.     Pursuant to Section 362(d) of the Bankruptcy Code, the automatic stay may be terminated and/or modified as appropriate either (i) for cause or (ii) with respect to property in which a debtor has no equity and is not required for an effective reorganization.[10]

49.     Ample grounds exist for stay relief as requested by Moe's under either Bankruptcy Code Section 362(d)(1) or Bankruptcy Code Section 362(d)(2).

50.     With respect to the Franchise Agreements, Debtors may not assume them without Moe's consent.  Moe's categorically refuses such consent with respect to Debtors.  Accordingly, to the extent that Debtors may reorganize successfully, they cannot do so through an assumption of the Franchise Agreements.  Accordingly, stay relief is warranted with respect to the Franchise Agreements as requested by Moe's.

51.     With respect to Bankruptcy Code Section 362(d)(1), the Bankruptcy Code provides that this Court shall grant automatic stay relief "for cause".  "Cause" in this context is not defined by the Bankruptcy Code but is determined on a case-by-case basis.  *In re Robertson*, 244 B.R. 880, 882 (Bankr. N.D. Ga. 2000).  "What constitutes cause is based on the totality of the circumstances in the particular case."  *Id.  See also Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir.1997); *Trident Assoc. v. Metro. Life Ins. Co. (In re Trident Assoc.)*, 52 F.3d 127, 131 (6th Cir.1995); *Claughton v. Mixson (In re Mixson)*, 33 F.3d 4, 5 (4th Cir. 1994) (citing

---

[10]    Bankruptcy Code Section 362(d) provides:  "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –

(1)  for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2)  with respect to a stay of an act against property under subsection (a) of this section, if -

*Robbins v. Robbins (In re Robbins)*, 964 F.2d 342, 345 (4th Cir. 1992)).  The interest in allowing Moe's to protect the Moe's System is extremely high and establishes requisite "cause".

52.     Moreover, the blatant filing of this bankruptcy case simply to avoid termination justifies "cause" as an exercise in "bad faith".

53.     "An automatic stay may be terminated for 'cause' pursuant to section 362(d)(1) of the Bankruptcy Code if a petition was filed in bad faith."  *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Virginia (In re Phoenix Piccadilly, Ltd.)*, 849 F.2d 1393, 1394 (11th Cir. 1988).  "[T]here is no particular test for determining whether a debtor has filed a petition in bad faith.  Instead, the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions'. . . ."  *Id.* (quoting *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir. 1984)).  The Court of Appeals for the Eleventh Circuit has stated that these factors "include the timing of the filing of the petition" and "whether the petition was filed strictly to circumvent pending litigation."  *Barclays-American/Business Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broadcasting, Inc.)*, 871 F.2d 1023, 1027 (11th Cir. 1989).

54.     The United States District Court for the Northern District of Georgia has enumerated additional factors for determining bad faith, including: (1) whether the petition effectively allows the debtor to evade court orders; (2) whether there is no possibility of reorganization; (3) whether reorganization essentially involves the resolution of a two-party dispute; and (4) whether the debtor filed solely to create the automatic stay.  *See, e.g., Northwest*

---

(A) the debtor does not have an equity in such property; and
(B) such property is not necessary to an effective reorganization …"

*Place, Ltd. v. Cooper (In re Northwest Place, Ltd.)*, 108 B.R. 809, 814-15 (Bankr. N.D.Ga. 1988) (listing factors).

55.     Upon consideration of these multiple factors, it is clear that Debtors' petitions were filed in bad faith.  The cases were filed just days before Moe's termination of the franchise for the Decatur Location was to become effective pursuant to the Arbitrator's Award.  The cases were filed solely to create the automatic stay.  If Moe's had not been on the verge of enforcing the termination of the Decatur Franchise Agreement, Debtors assuredly would not have filed the bankruptcy petitions.

56.     Moreover, the cases essentially involve the resolution of a two-party dispute. Debtors' only significant assets are the Franchise Agreements.  Schedules A and B filed by the Debtors show no real property or personal property except related to the Moe's Restaurants.

57.     Debtors' attempt to use this case as a vehicle to circumvent the termination of the Decatur Location is another clear indication of bad faith.  The Schedules give no indication that Debtors are unable to meet their obligations on an ongoing basis; yet another indication of "bad faith".

58.     A finding of bad faith is "based on a conglomerate of factors rather than on any single datum."  *In re Northwest Place, Ltd.*, 108 B.R. at 814.  Here, numerous factors show that the Debtor filed bankruptcy in bad faith.  Therefore, pursuant to Bankruptcy Code Section 362(d)(1), the automatic stay should be terminated for cause.

59.     Accordingly, for the reasons recited above, Moe's seeks authorization to exercise its rights under the Bankruptcy Code to terminate these Franchise Agreements.

WHEREFORE, Moe's respectfully requests this Court to enter an order (i) terminating the automatic stay under Bankruptcy Code 362(d) to allow Moe's to exercise its rights to terminate the Franchise Agreements; and (ii) granting Moe's such other and further relief as justice requires.

**DLA PIPER LLP (US)**

*/s/  Mark J. Friedman*
Mark J. Friedman, Admitted *Pro Hac Vice*
(Maryland Bar No. 00102)

DLA PIPER LLP (US)
The Marbury Building
6225 Smith Avenue
Baltimore, MD  21209-3600
Telephone:  (410) 580-4153
Facsimile:  (410) 580-3001
E-Mail:  mark.friedman@dlapiper.com

Benjamin Prevost, GA Bar # 141594
DLA Piper LLP (US)
Suite 2800
Atlanta, GA 30309-3450
Telephone:  404-736-7800
Facsimile:  404-682-7800
E-Mail:  ben.prevost@dlapiper.com

*Counsel for Moe's Franchisor LLC*

EAST\95887882.4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of February, 2015, a copy of the foregoing Motion by Moe's Franchisor LLC for Relief from the Automatic Stay to Exercise All Rights Under Franchise Agreements, Including Termination was served on all parties listed below by first-class mail, unless said party is a registered CM/ECF participant and the Notice of Electronic Filing indicates that notice was electronically mailed to said party.

> Will B. Geer
> Law Office of Will B. Geer, LLC
> Suite 225
> 333 Sandy Springs Circle, NE
> Atlanta, Georgia  30328
>
> Taylor Investment Partners II, LLC
> 4605 Ponte Vedra Dr., SE
> Marietta, Georgia 30067
>
> TIP II-Suburban, LLC
> 4605 Ponte Vedra Drive, SE
> Marietta, Georgia  30067
>
> Lindsay N. P. Swift
> Office of the US Trustee
> Suite 362
> 75 Spring Street, SW
> Atlanta, Georgia  30303
>
> Nathan A. Wood
> McGuireWoods
> Promenade
> 1230 Peachtree Street, N.E.
> Suite 2100
> Atlanta, GA 30309-3534
>
> TIP II-Ansley, LLC
> 4605 Ponte Vedra Drive, SE
> Marietta, Georgia  30067
>
> Focus Brands Inc.
> 200 Glenridge Point Parkway
> Suite 200
> Atlanta, Georgia 30342-1450

EAST\95887882.4

Internal Revenue Service
CIO
P.O. Box 7346
Philadelphia, Pennsylvania  19101-7346

Chamberlain Hrdlicka
191 Peachtree Street, N.E.
Thirty-Fourth Floor
Atlanta, Georgia 30344

Georgia Department of Revenue
Compliance Division
ARCS Bankruptcy
1800 Centure Boulevard, N.E.
Suite 9100
Atlanta, Georgia 30345-3202

Magoon Freeman Spain & Jones
3600 Mansell Road
Suite 575
Alpharetta, Georgia 30022

Cohen Pollack Merlin & Small
3350 Riverwood Parkway
Suite 1600
Atlanta, Georgia 30339-3359

Ichter Thomas LLC
3340 Piedmont Road, N.E.
Suite 1530
Atlanta, Georgia 30326

Regions Bank
Corporation Service Company
40 Technology Parkway
Suite 300
Norcross, Georgia 30092-2924

By: */s/  Mark J. Friedman*

- 22 -