## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE:                    , | ) | CHAPTER 11 |
| Taylor Investment Partners II, LLC | ) | |
| | ) | |
| Debtor. | ) | CASE NO. 15-51333 - MHM |
| | ) | JUDGE MURPHY |
| _____ | ) | _____ |
| | ) | |
| MOE'S FRANCHISOR, LLC | ) | |
| | ) | |
|               Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Taylor Investment Partner, II, LLC; | ) | CONTESTED MATTER |
| TIP II-Suburban, LLC; and | ) | |
| TIP II-Ansley, LLC, | ) | |
| | ) | |
|               Respondents. | ) | |

### RESPONSE OF DEBTORS TO MOTION BY MOE'S FRANCHISOR LLC FOR RELIEF FROM THE AUTOMATIC STAY TO EXERCISE ALL RIGHTS UNDER FRANCHISE AGREEMENTS, INCLUDING TERMINATION

COME NOW, Taylor Investment Partners II, LLC ("Taylor Investment"), TIP II-Ansley, LLC ("Ansley"), and TIP II-Suburban, LLC ("Suburban") (collectively, the "Debtors"), and file this response to Moe's Franchisor LLC's ("Moe's") Motion for Relief from Stay (the "Motion for Relief") (Doc. 44).

### Introduction

Moe's Motion for Relief should be denied for lack of "cause" for the following reasons:

1.     Debtors did not file their cases in bad faith. These cases clearly lack the aggravating factors of either the *Piccadilly*[1] case or the *Northwest Place, Ltd.*[2] case. Taylor Investment has one large secured debt, an aggressive unsecured creditor with a disputed debt, and two operating franchised restaurants with numerous employees. Moe's has engaged in a history of bad faith conduct, including, among other things, an attempted use of improperly performed internal franchise inspections to unlawfully terminate the franchise agreements only eight days after Debtors filed a law suit against Moe's and summarily denying Debtors' contractual right for counseling and advice on preparing for an unannounced franchise inspection.

2.     Debtors may assume the franchise agreements under 11 U.S.C. 365. With regard to this Court's interpretation of 11 U.S.C. § 365(c) and the ability of a franchisee to assume a franchise agreement without the franchisor's consent, this Court may adopt the "actual test". Moe's citation to *City of Jamestown v. James Cable Partners, L.P. (In re James Cable Partners, L.P.),* 27 F.3d 534 (11th Cir. 1994) as binding authority that the 11th Circuit has adopted the "hypothetical test" is misplaced. The holding in *James Cable Partners, L.P.* was based only on what constituted "applicable law" under Section 365(c). Any discussion of the hypothetical test was mere dictum, and this Court is free to adopt the actual test, which coincides with legislative history, the spirit of the bankruptcy code,

---

[1] *Phoenix Piccadilly, Ltd. V. Life Ins. Co. of Virginia (In re Phoenix Piccasilly, Ltd.)*, 849 F.2d 1393, 1394 (11th Cir. 1988).

[2] *In re Northwest Place, Ltd.*, 108 B.R. 814 (Bankr. N.D.Ga. 1988).

and the recommendations of the two leading bankruptcy treatises - Collier on Bankruptcy (*3 Collier on Bankruptcy*, ¶ 365.06[1][d] at 365-67-72 (15th ed. rev. 2006)) and Norton Bankruptcy Law and Practice 2d (*Norton Bankr. Law & Practice 2d*, § 39:20 at 39-70 (2006)).

## Background

TIP II-Ansley and TIP II-Suburban operate two Moe's Southwest Grill restaurants located at 1544 Piedmont Avenue, N.E., Suite 303, Atlanta, Georgia 30324 (the "Ansley Moe's") and 1524 Church St., Suite A, Decatur, Georgia 30030 (the "Decatur Moe's"), respectively.

On May 15, 2003, Taylor Investment entered into the Assignment, Assumption and Consent Agreement (the "Ansley Assignment" attached hereto as Exhibit "A") by which Taylor Investment, with the required consent of Moe's, acquired the rights from a previous franchisee to operate the Ansley Moe's subject to the Moe's Southwest Grill, L.L.C. Franchise Agreement dated September 6, 2002 entered into between Moe's predecessor and the predecessor franchisee and as attached hereto as Exhibit "B."

Pursuant to that Moe's Southwest Grill, L.L.C Franchise Agreement dated March 5, 2004 (the "Decatur Franchise Agreement") entered into between Moe's predecessor and Taylor Investment, Taylor Investment's affiliate, TIP II-Suburban, LLC, began to operate the Decatur Moe's. A true and correct copy of the Decatur Franchise Agreement is attached hereto as Exhibit "C".

### History of Problems Between Taylor Investment and Moe's

Moe's and Debtors have had a tumultuous relationship. In 2004, Moe's required Taylor Investment to decorate its restaurants with artwork of famous, deceased musicians, *e.g.*, Frank Sinatra, Elvis, Jimmy Hendrix, etc., containing lyrics tied in with Moe's tag lines. Apparently, Moe's did not have legal authority to use these images or lyrics. As a result, on or about December 8, 2004, several Moe's franchisees, as well as TIP II-Ansley, LLC, were sued in the U.S. District court for the Northern District of Georgia in an action styled as *Jerry Garcia Estate, LLC v. Moe's Southwest Grill, LLC*, *et al.*, No. 1:04-CV-03591-TCB.

Upon information and belief, the matter was settled pursuant to a consent order that included an injunction prohibiting the unauthorized display of these images and lyrics. Subsequently, Moe's ran a promotion where patrons submitted photos of themselves impersonating famous, deceased musician for display at Moe's restaurants. Taylor Investment refused to participate for fear of violating the aforementioned injunction.

On or around August 2007, when Focus Brands acquired the Moe's franchise, Steve Romanello, Focus's CEO, and Paul Damico, the President of Moe's Southwest, met with Mr. David Titshaw and proposed that Taylor Investment voluntarily exit the Moe's franchise system. Taylor Investment declined.

Ansley and Suburban have been in business for well over ten years and operate under "legacy" franchise agreements with Moe's. Those "legacy" franchise agreements

include terms that are in many ways substantially more favorable to the franchisees than exist in the more recent and current franchise agreements utilized by Moe's. As a result, Moe's would like nothing more than to terminate Debtors' agreements and install new franchisees who will be bound by the far more favorable terms of the new franchise agreements.

In or around 2010, during a meeting of the Atlanta Coop Advertising Board, Damico publicly criticized Taylor Investment for offering a certain promotion on more favorable terms than those required by Moe's. Taylor Investment's position was that the Franchise Agreements allowed it to do so. In response, Damico told Mr. Titshaw that he "did not intend to govern ["their"] relationship by the terms of the Franchise Agreement.

### The Improperly Conducted ROSE Reports

Moe's uses an internal auditing and inspection mechanism known as the Restaurant Operations and Standards Evaluation ("ROSE") report to ensure certain "Sanitary and Quality Assurance" standards pursuant to the "Moe's Southwest Grill Operations Manual" ("Operations Manual"). Each Moe's restaurant is inspected unannounced using the ROSE report at least twice per year.

Upon information and belief, after August 2007, when Focus Brands acquired the Moe's franchise, Moe's and Coca-Cola entered into a contract containing language allowing Coca-Cola to pay rebates to Moe's based on franchisee purchases. As a result, on or about June 5, 2012, Taylor Investment filed a Complaint in the Magistrate Court of

Fulton County, Georgia styled as *Taylor Investment Partners II, LLC, et al. v. Focus Brands, Inc., et al.*, No. 12MS149263 requesting a declaratory judgment and asserting claims for breach of contract and conspiring to violate anti-trust laws (the "Coca-Cola Litigation"). Eight days later, Moe's conducted ROSE inspections at each of Debtors' restaurants, and, for the first time after a decade of operation, gave both restaurants failing scores.

Not surprisingly, Moe's acted swiftly to give Debtors failing scores on two follow-up ROSE inspections so that they could exercise their right of termination under the franchise agreement to force Debtors out of the franchise. Notably, the 3rd ROSE inspection that Suburban failed was taken less than 24 hours after Suburban was given the second highest possible score by Steritech, an independent, third- party franchise inspector that focuses on health, cleanliness, and workplace safety.

After Moe's attempted to terminate the franchise agreements based on these arbitrarily and capriciously performed inspections, Debtors' counsel requested a meeting to extend the termination deadline to show that the termination was not proper or justified. This meeting proved unproductive because Moe's presented an "offer" to Debtors to force the sale of both franchises in a short period of time, further exposing Moe's true motives. The parties ultimately took the matter of whether the ROSE reports were performed fairly and properly before an arbitrator.

Moe's asserts that Debtors failed three (3) improperly performed ROSE reports that led to the parties arbitrating whether these inspections were done fairly and impartially. Despite the false allegations by Moe's that the restaurants were unclean and in disrepair (Moe's MFR, ¶30), the arbitrator specifically found that "the deficiencies found by Moe's evaluators *were not* basically food safety or related hygiene issues." (Ex. D, p. 3, Arbitrator's Award).

The arbitrator ultimately found that Moe's could not meet its burden of showing that all the ROSE inspections were properly and fairly administered. As part of the Award providing that Moe's did not properly conduct the ROSE reports instigated after the Magistrate Court Litigation, the arbitrator held that each location was to receive an additional ROSE inspection [*See* Arbitrator's Award, p. 5].

On or about July 25, 2014, Moe's conducted the post-arbitration ROSE inspection (the "July ROSE Report", attached hereto as Exhibit "E"). Of course, the July ROSE Report was performed improperly and unfairly, and it is no coincidence that Debtors' more profitable store, the Decatur location, failed the ROSE report as administered with a score of 72% (a score of 80% is required to pass).

Pursuant to Paragraph 9 of the Franchise Agreements and Item 11 of the 2003 Uniform Franchise Offering Circular ("UFOC," attached hereto as Exhibit "F")[3], Moe's

---

[3] The 2003 UFOC provides: After the franchised restaurant is opened for business, we will do the following pursuant to the terms of the Franchise Agreement:

is obligated to provide consultation and advice regarding "(g) operational problems and procedures; and (h) periodic inspections . . . ." According to two Moe's employees under sworn testimony, this obligation is exercised by the franchisee requesting a voluntary ROSE inspection to ensure compliance with the unannounced ROSE inspection. (Ex. G., Shotter Dep. 83:8-19), (Ex. H, Slaton Dep. 30:21-23). Indeed, each ROSE Report indicates whether an inspection was "Announced" or not. (Ex. E, p. 2).

Shortly after the arbitrator issued his award ordering Moe's to conduct one more unannounced ROSE inspections at each restaurant, Mr. Titshaw requested an announced, voluntary ROSE inspection at each location. Moe's summarily and improperly denied Mr. Titshaw's request for a voluntary inspection in clear violation of the UFOC and Franchise Agreements.

Moe's has a history of using internal audits and ROSE reports to "lean on" and intimidate franchisees. *See* internal Moe's email of Focus Brands' predecessor attached hereto as Exhibit "I".

Notably, there is no evidence that Moe's has been financially harmed. There is no evidence that Debtors have failed any health department inspections; Moe's has not

---

3. Upon your request, furnish counseling and advisory services to you on subjects including equipment selection and layout, employee selection and training, advertising and promotion, recipes, food, formulas and specifications, bookkeeping and accounting, purchasing and inventory control, **operational problems and procedures, periodic inspections** and new developments and improvements in the MOE'S System (Franchise Agreement – Paragraph 9). (emphasis added).

alleged that Debtor has misused any of its proprietary marks; and one of Debtors' managers recently completed his Focus manager's training certification.

Moreover, Debtors' stores ranked 6th out of 17 stores in its region on a Regional Performance Report involving secret shoppers visiting each franchise location and ranking food quality, speed of service, employee appearance, and overall experience. Debtors scored a 94.94 out of 100 on the Regional Performance Report, so clearly the customers are happy with the Moe's experience at Debtors' franchises. A true and correct copy of the Regional Performance Report results is attached hereto as Exhibit "J".

Debtors, in the aggregate, have approximately $79,643.96 of unsecured debt and $73,813.88 of secured debt. Moe's is not a creditor of Debtors. Debtors owe Moe's no back-franchise fees. A representative from Chamberlain Hrdlicka, a law firm holding a disputed debt of over $25,000.00, asked the majority of questions at Debtors' 341 meeting.

### Cause Does Not Exist to Grant Relief from the Stay Pursuant to 11 U.S.C. § 362(d)(1) or (d)(2)

Pursuant to Section 362(d) of the Bankruptcy Code, the automatic stay may be terminated or modified for either (i) cause or (ii) with respect to property in which a debtor has no equity and is not required for an effective organization. 11 U.S.C. § 362(d).

"Cause" is not defined in the Bankruptcy Code, and as a result, "courts decide 'whether [such] discretionary relief is appropriate on a case-by-case basis.'" *State Bank of Florence v. Miller (In re Miller)*, 513 F. App'x 566, 575 (6th Cir. 2013) (*citing Laguna*

*Assoc. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assoc. Ltd. P'ship)*, 30 F.3d

734, 737 (6th Cir. 1994)); *In re Robertson*, 244 B.R. 880, 882 (Bank. N.D. Ga. 2000).

 The moving party has the burden to make an initial showing of "cause" for relief

from the stay. *See* 11 U.S.C. § 362(d)(1); *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285

(2d Cir. 1990); *Laguna Assocs. Ltd. P'ship v. Aetna Life and Cas. Surety Co. (In re

Laguna Assocs. Ltd. P'ship)*, No. 92-75390, 1993 WL 730746, at *5 (E.D. Mich. Apr. 12,

1993), aff'd 30 F.3d 734 (6th Cir. 1994) (collecting cases).

 Once cause is established, the burden shifts to debtor to prove that it is entitled to

the protections of the stay. *See* 11 U.S.C. § 362(g)(2); *Laguna Assocs.*, 1993 WL 730746,

at *5; *In re Holly's, Inc*., 140 B.R. 643, 683 (Bankr. W.D. Mich. 1992) (quoting *Sonnax

Indus.*, 907 F.2d at 1281).

 Moe's has failed to carry its burden that cause exists to terminate the stay. Moe's

two primary arguments in support of its motion are: (1) that the instant case was filed in

bad faith, and (2) that 365(c) prevents debtor from assuming the franchise agreements

without Moe's consent. As Debtors will show, Debtors did not file their cases in bad

faith, and a proper interpretation of 365(c) will allow Taylor Investment to assume the

franchise agreements.

### A. Debtors Did Not File Bankruptcy in Bad Faith.

 The seminal case on bad faith in the 11th Circuit is *Phoenix Piccadilly, Ltd. V. Life

Ins. Co. of Virginia (In re Phoenix Piccasilly, Ltd.)*, 849 F.2d 1393, 1394 (11th Cir. 1988).

"[T]here is no particular test for determining whether a debtor has filed a petition in bad faith. Instead, the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or, in particular, factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'" *Id.* (quoting *Albany Partners, Ltd. V. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670, 674 (11th Cir. 1984)). "The factors cited by both the Eleventh Circuit and other courts are guidelines for the exercise of the Court's sound discretion. Bad faith in the filing of a bankruptcy petition is a finding of fact not subject to any per se approach." *In re Clinton Fields, Inc.*, 168 B.R. 265, 269 (Bankr. M.D.Ga. 1994).

In *Piccadilly*, the 11th Circuit affirmed the bankruptcy court's findings of bad faith in the context of a single asset real estate debtor filing bankruptcy the day before a receiver was to be appointed with regards to debtor's real property. *Id.* at 1394. Moreover, debtor in *Piccadilly* was also found to engage in forum shopping by filing its bankruptcy case over 700 miles away its assets, secured and unsecured creditors, and employees. *Id.* at 1395. As Moe's cites, a finding of bad faith is "based on a conglomerate of factors rather than on any single datum." *In re Northwest Place, Ltd.*, 108 B.R. 814 (Bankr. N.D.Ga. 1988).

This case lacks the aggravating factors that were present in *Piccadilly*. In this case, Debtors have over two dozen part-time and full-time employees, numerous assets

throughout both restaurants, one large secured creditor, and numerous unsecured creditors, including a disputed legal bill that unsecured creditor Chamberlain Hrdlicka alleges is over $75,000.00. Debtors purpose in filing bankruptcy was to stop any potential collection action by law firm Ichter Thomas and Chamberlain Hrdlicka, as well as to stop the bad faith termination of the franchise agreement by Moe's.

Furthermore, it is hypocritical of Moe's to use bad-faith tactics in an attempt to unlawfully terminate the franchise agreement of Debtors while arguing that Debtors filed the instant cases in bad faith. All creditors' state court rights are going to be frustrated to a degree by the filing of a bankruptcy petition, but notably in this case, Moe's is not owed **any** back franchise fees (and is thus not a creditor in this case), and it's only basis for terminating Debtors' most profitable store is an inappropriately performed ROSE inspection in a bad faith attempt to force Debtors to sell both locations.

### B.  The Franchise Agreement May Be Assumed Without Moe's Consent The "Hypothetical Test" vs. the "Actual Test"

Under 11 U.S.C. §365(a), a debtor-in-possession has the authority, subject to §365(c), to assume or reject an executory contract such as a franchise agreement.[4]  The

---

[4] Bankruptcy Code Section 365(c) provides: "The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties if –

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment . . ."

confusion sets in when courts begin to interpret Section 365(c)(1)'s "assume or assign" language. Courts reading the statute in the disjunctive follow the so-called "hypothetical test," while courts reading the statute in the conjunctive (i.e. "assume *and* assign") follow the "actual test." *See In re Sunterra Corp., 361 F. 3d 257* (4ᵗʰ Cir. 2004) (describing the conjunctive vs. disjunctive argument).

The hypothetical test is best described in *In re West Electronics*, holding that "11 U.S.C. § 365(c)(1) creates a hypothetical test – i.e., under applicable law, could the government refuse performance from an entity other than the debtor or the DIP?" 852 F.2d 79, 83 (3d. Cir. 1988). The Ninth Circuit simply states that § 365(c)(1)(B)'s language means that "a [DIP] may assume or assign an executory contract only if hypothetically it [may] assign that contract to a third party." *N.C.P. Mktg. Group, Inc. v. BG Star Prods.*, 129 S.Ct. 1577 (2009) (citing *In re Catapult Entertainment, Inc.*, 165 F.3d, 747 (9ᵗʰ Cir. 1999). So if the DIP, hypothetically, could not assume *and* assign the trademark license of a franchisee, then it does not have the right to assume the license even if it has no actual intention of assigning the license to a third-party.

The First Circuit[5] and "the great majority of lower courts" reject the hypothetical test in favor of the actual test. *See In re Footstar, Inc.*, 323 B.R. 566, 599 n. 2 (Bankr. S.D.N.Y. 2005). Courts adhering to the actual test interpret Section 365(c)(1)(B) in the conjunctive. In *Institut v. Cambridge*, the First Circuit held that Section 365 contemplates

---

[5] *Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1ˢᵗ Cir. 1997); *Summit Inv. and Development Corp. v. Leroux*, 69 F. 3d 608 (1ˢᵗ Cir. 1995).

a case-by-case inquiry into whether the licensee actually was being forced to accept performance from someone other than debtor/licensee. 104 F.3d at 493. In other words, under the actual test and in the context of a franchise agreement, if debtor/franchisee has no intention of ***actually*** assigning the franchise agreement to a third party, it may assume the franchise agreement. *See Footstar*, 323 B.R. at 570. So courts that follow the reasoning of the First Circuit look to what the franchisee actually plans to do with the license rather than what the licensee hypothetically could do. *Id.* This interpretation clearly allows debtor to maximize the value of the franchise agreement and avoid the unearned windfall received by the franchisor under the hypothetical test.

### This Court May Adopt Either the Actual or Hypothetical Test

Moe's cites the 11th Circuit case of *In re James Cable Partners, L.P.* as binding authority that a franchisee cannot assume a franchise agreement without the franchisor's consent in the 11th Circuit. 27 F.3d 534 (11th Cir. 1994). There is a split of opinion as to whether the 11th Circuit has truly adopted the "hypothetical test" when interpreting 11 U.S.C. §365(c)(1). *See In re Sunterra Corp., 361 F. 3d 257* (4th Cir. 2004); *but see In re Footstar, Inc.*, 323 B.R. 566, 570 at n.3 (Bankr. S.D. N.Y. 2005); Charles H. Jeanfreau, *Intellectual Property Issues in Bankruptcy,* 1 Bloomberg Corp. L.J. 371, note 5 at n. 48 (noting that the court in *In re James Cable Partners, L.P.* articulated the hypothetical test

but appears to have applied the actual test); Robert L. Eisenbach, III, The Section 365(c)(1)(A) Debate: "Actual" or "Hypothetical"? A Circuit-by-Circuit Look[6].

It is clear that the 11th Circuit in *In re James Cable* only discussed the hypothetical test in dicta. 27 F.3d at 537. Statements in an opinion that are "not necessary to the decision of an appeal given the facts and circumstances of the case" are dicta. *Aron v. United States*, 291 F.3d 708, 716 (11th Cir. 2002). And "dicta is not binding on anyone for any purpose." *Edwards v. Prime, Inc.,* 602 F.3d 1276, 1298 (11th Cir. 2010).

Indeed, the 11th Circuit acknowledged that the bankruptcy and district court opinions that it affirmed specifically rejected the hypothetical test. *Id.* at 537, n. 6; *see also In re James Cable Partners, L.P.*, 154 B.R. 813, 815 (M.D. Ga. 1993) The court in *In re James Cable* did not reach the issue of whether or not the actual or hypothetical test should be used because the court found that no "applicable law" excused the city from accepting performance from an entity other than debtor. *See id.* at 538. In other words, there was no trademark law to act as "applicable law" to block the assignment of the franchise agreement, so the 11th Circuit affirmed the holding of the lower courts based on Section 365(c)(1)(A) without having to analyze Section 365(c)(1)(B). *Id.*

Notably, the 11th Circuit in *James Cable* stated in a footnote that 11 U.S.C. § 365(c)(1) is written in the conjunctive. 27 F.3d at 537, n. 5. As discussed *supra*, courts that interpret Section 365(c)(1) in the conjunctive have actually adopted the actual test, so

---

[6] http://inthered.wp.lexblogs.com/wp-content/uploads/sites/245/2007/04/Section_365_c__1__Chart1.pdf

this footnote contradicts the use of the hypothetical test. *See In re Sunterra Corp.,* 361 F.3d at 257. Regardless, it is clear that the 11th Circuit's usage of the hypothetical test in *James Cable* was strictly in dicta and is not binding on this court. As a result, this court is free to adopt the actual test.

**The Court Should Adopt the Actual Test and Allow Debtor to Assume the Franchise Agreement.**

Congress intended Section 365(c)(1) "to be applied narrowly." *In re C.W. Mining Co.*, 422 B.R. 746, 761 (BAP 10th Cir. 2010). Accordingly, numerous courts have rejected the "hypothetical test" approach in favor of an "actual test" to determine whether applicable law excuses a non-debtor party to the executory contract from performance. *See, In re Mirant Corporation*, 440 F.3d 238 (5th Cir. 2006); *Summit Inv. & Dev. Corp. v. Leroux*, 69 F.3d 608, 613 (1st Cir.1995); *Cajun Elec. Members Comm. v. Mabey (In re Cajun Elec. Power Co-op., Inc.)*, 230 B.R. 693, 705 (Bankr. M.D. La.1999); *In re Lil′ Things, Inc.*, 220 B.R. 583, 587 (Bankr. N.D. Tex.1998); *In re Hartec Enters., Inc.*, 117 B.R. 865, 871 (Bankr. W.D.Tex. 1990); and *In re Footstar, Inc.*, 323 B.R. 566 (Bankr. S.D.N.Y. 2005).

Likewise, both Collier (*3 Collier on Bankruptcy*, ¶ 365.06[1][d] at 365-67-72 (15th ed. rev. 2006)) and Norton Bankruptcy Law and Practice 2d (*Norton Bankr. Law & Practice 2d*, § 39:20 at 39-70 (2006)) recognize that the legislative history supports the actual test. *See also Footstar*, 323 B.R. at 574-575. Collier notes that:

"Although a literal reading of the amended version may bar assumption by a debtor in possession, there seems to be little reason for the amendment unless there was an intention to permit a debtor in possession to assume otherwise nonassignable contracts. Similarly, for the purposes of determining whether a debtor in possession may assume contracts that would not be assignable under nonbankruptcy law, the debtor in possession may be treated as the same entity as the debtor, entitled to assume the contract. Only if the debtor in possession sought to assign the contract would the nonbankruptcy limits apply. *Collier*, 365.06[1][d] at 365-67-72.

As originally enacted in 1978, Section 365(c)(1)(a) provided as follows:

(1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance ***to the trustee or an assignee of such contract or lease***, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties. (emphasis added). Pub.L. No. 95-598 (1978)

The 1984 amendment changed the emphasized language of Section 365(1)(A) from "to the trustee or assignee of such contract or lease" to "an entity other than the debtor or the debtor in possession." The Committee on the Judiciary published a report in conjunction with the 1980 proposed bill, the language of which the 1984 amendment adopted, explaining:

This amendment makes it clear that the prohibition against a trustee's power to assume an executory contract does not apply where it is the debtor that is in possession and the performance to be given or received under a personal service contract will be the same as if no petition had been filed because of the personal nature of the contract. H.R. REP. NO. 1195, 96th Cong., 2d Sess., §27(b) (1980).

As mentioned *supra*, Courts that follow the actual test look to what the licensee/franchisee actually plans to do with the license rather than what the licensee could hypothetically do under the circumstances in the future. *See Institut Pasteur*, 104

F.3d at 493. Courts that reject that hypothetical test have recognized that blocking the assumption of an executory contract because such agreements cannot be assigned would allow franchisors and licensors an unearned windfall at the expense of not only debtor, but its creditors and bankruptcy estate as well. *See generally Id.; In re Cumberland Corral, LLC*, Case No. 313-06325 (Bankr. M.D. TN 2014). Indeed, the 5th Circuit has not adopted the hypothetical test because "[t]his approach takes the somewhat nonsensical path that would prevent the assumption of an executory contract if applicable law would preclude the assignment of that contract, even when no assignment was intended or contemplated." *In re Jacobsen*, 465 B.R. 102, 105 (Bankr. N.D. Miss. 2011). As the court in *Texaco, Inc. v. La. Land & Exploration Co.* eloquently stated:

> "The [hypothetical test] tends to defeat the basic bankruptcy purpose of enhancement of the bankruptcy estate for benefit of rehabilitation and the general creditors upon a highly technical "hypothetical" test which furthers no bankruptcy purpose at all." 136 B.R. 658, 669 (Bankr. M.D. La. 1992) (concluding the Third Circuit's *West* hypothetical test is incorrect for three primary reasons).

The hypothetical test also violates a basic rule of statutory construction that a court should give effect to every word in a statute. See *Bailey v. United States*, 516 U.S. 137, 146 (1995). If the directive of Section 365(c)(1) is to prohibit assumption whenever applicable law excuses performance relative to *any* entity other than the debtor, there

would be no point in adding the words "or debtor in possession?" 11 U.S.C. § 365(c)(1). The hypothetical renders this phrase surplusage.

Because the hypothetical frustrates the purpose of the bankruptcy code and essentially permits a non-debtor, non-creditor party to terminate its contract with debtor via an ipso facto clause in derogation of Section 365(e) of the Bankruptcy Code, this Court should adopt the actual test and find that Debtor can assume the franchise agreement without Moe's consent.

**Failing a ROSE Report is an Immaterial Default That Does Not Preclude Debtor from Assuming the Franchise Agreements.**

Even if the Court were to decide that the July ROSE Report was properly conducted and it was grounds for termination pursuant to the franchise agreement, it would not preclude Taylor Investment from assuming the franchise agreement. "Where the default is non-monetary and is not curable, debtor is precluded from assuming an executory contract only if the default was material or if the default caused `substantial economic detriment.'" *In re Cumberland Corral,* LLC, Case No. 313-06325 (Bankr. M.D. TN 2014) (quoting *In re Chapin Revenue Cycle Mgmt., LLC*, 343 B.R. 728, 731 (Bankr. M.D. Fla. 2006) (citations omitted); *In re Clearwater Natural Res., LP*, No. 09-70011, 2009 WL 2208463, at *4 (Bankr. E.D. Ky. July 23, 2009) (materiality and economic significance of default is measure of whether debtor may assume a contract in which a non-curable, non-monetary default has occurred).

In *Cumberland Corral*, Debtor owned a Golden Corral franchise in which the franchisor alleged that two of Debtor's locations failed three of the equivalent of Moe's ROSE reports, known as CSQ, or Cleanliness, Service, and Quality reports in the Golden Corral franchise universe. *Cumberland* at p. 7. Similar to ROSE reports, CSQ reports consist of four components: hospitality, food quality, food safety, and cleanliness. *Id.* Though the evidence uncovered that Debtor had only failed two out of the three requisite CSQ reports, the Court found that

> "even if there were defaults under the Franchise Agreements for the [Golden Corral] Restaurant[s], such defaults were immaterial and have not caused substantial economic detriment." *Id.* at 27.

Here, as in *Cumberland*, there are no allegations related to health and safety violations; Debtor has passed all health-department inspections with a grade of greater than 90; and Moe's has suffered no monetary damage as a result of the alleged failed ROSE report.

For the foregoing reasons, cause does not exist to lift or modify the automatic stay and permit Moe's to exercise its right to terminate the franchise agreements.

This 19th day of March, 2015

Respectfully submitted by:
Law Office of Will B. Geer, LLC
Counsel for Debtors

/s/ Will B. Geer

Will B. Geer
Georgia State Bar No. 940493
333 Sandy Springs Circle, NE
Suite 225
Atlanta, Georgia 30328
(678) 587-8740: T
(404) 287-2767: F
willgeer@willgeerlaw.com